**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| AMERICAN GUARANTEE AND | § | |
| LIABILITY INSURANCE COMPANY and | § | |
| SATTERFIELD & PONTIKES | § | |
| CONSTRUCTION, INC. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-15-1926 |
| | § | |
| UNITED STATES FIRE INSURANCE | § | |
| COMPANY | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Satterfield & Pontikes Construction, Inc. (S&P) contracted to build a courthouse in Zapata County, Texas. Various problems came to light in the years following the building's completion, culminating in a roughly $8 million arbitration award against S&P and in favor of Zapata County. The current lawsuit is about who will be left holding the bag as between S&P, two primary insurers—American Guarantee and Amerisure—and an excess insurer—US Fire. The parties filed cross-motions for summary judgment, responses, and replies, (Docket Entries No. 47, 51, 57, 84, 86, 87, 89, 90, 91, 92), and the court heard oral argument on the motions. At oral argument, the court told the parties its tentative rulings on each issue and encouraged the parties to explore settlement before the court made final rulings. American Guarantee (AGLIC) filed a supplemental brief, to which US Fire responded. (Docket Entries No. 103, 107). The court heard additional argument after the parties advised the court that they had not been able to settle.

1

The summary judgment motions present two core disputes. One dispute pits S&P and its primary insurers against the excess insurer, US Fire. The other is a dispute between Amerisure and AGLIC over how to allocate costs within the primary insurance layer.

Based on the briefs, the summary judgment record, the arguments, and the applicable law, the court rules as follows:

(1) in the dispute between S&P, AGLIC, and Amerisure on the one hand and US Fire on the other, US Fire prevails and S&P takes nothing; and

(2) in the dispute between AGLIC and Amerisure, AGLIC's motion is granted in substantial part and Amerisure's motion is denied in substantial part.

The reasons for these rulings are explained in detail below.

## I.     Background

S&P was the prime contractor for the construction of a courthouse for Zapata County, Texas. AGLIC wrote S&P's commercial general liability policy in 2006-2007, and Amerisure wrote S&P's commercial general liability for 2007-2011. (Docket Entry No. 47 at 8). Both policies had a per-occurrence limit of $1,000,000 and an aggregate limit of $2,000,000. (*Id.*). US Fire wrote S&P's excess policy, which had a $25,000,000 per occurrence *and* aggregate limit. (*Id.* at 8-9). The US Fire policy contained a "Fungi and Bacteria Exclusion" barring coverage for any "property damage" resulting from exposure to fungi, including mold, or bacteria. (Docket Entry No. 47-15, Ex. C-1 at 35).[1]

Zapata County was dissatisfied with S&P's construction work on the courthouse, and it eventually sued. S&P invoked AGLIC's 2006-07 commercial general liability policy to provide

---

[1] US Fire points out that AGLIC and Amerisure's policies also contained fungi and bacteria exclusions. *See* Docket Entry No. 47-2 at 18 (AGLIC policy fungi and bacteria exclusion); Docket Entry No. 69-4 at 36 (Amerisure policy fungi and bacteria exclusion).

coverage. (Docket Entry No. 47 at 7). AGLIC provided a defense. (Docket Entry No. 47-5, Ex. A at 1 ¶ 3). The suit went to arbitration. The arbitration panel found in favor of the County. The panel found

> that S&P failed to build the courthouse in a good and workmanlike manner, in accordance with the proper standards of care and in accordance with the plans and specifications. S&P also failed to properly supervise its subcontractors. S&P's failures to perform resulted in monetary damages to Zapata as set forth below. The Panel further finds that the courthouse suffered physical harm and damage as a result of S&P's failures to perform.

(Docket Entry No. 47-10, Ex. B-1 at 8). The total award, including postjudgment interest, was $8,063,641.78. The arbitration award was set out in categories based on the "phases" of remedial work the County had to do to repair the courthouse's problems. The award was as follows:

- $2,800,000 for Phase I (primarily reconstruction of the courthouse dome and mold remediation throughout the courthouse building);
- $855,000 for Phase II (primarily replacement of the courthouse roof and repairs to the roof flashing);
- $2,417,000 for Phase III, subdivided as follows:
    $1,000,000 for fireproofing replacement;
    $150,000 for repair and replacement of terrazzo flooring;
    $563,000 for window repairs;
    $30,000 for HVAC cleaning and sealing;
    $100,000 for professional services associated with the Phase III repairs;
    $574,000 for "Mark ups" related to professional services to carry out the repairs.
- $1,500,000 in attorney's fees;
- $430,458 in prejudgment interest; and
- $29,909.74 in administrative costs relating to the arbitration.

(*Id.* at 9-12). The County secured a judgment to enforce the arbitration award. (Docket Entry No. 47-11, Ex. B-2).

S&P's subcontractors were parties to the arbitration until S&P entered into settlement agreements with those subcontractors. (Docket Entry No. 47-10, Ex. B-1 at 2-3). The total value of those settlements was $4,492,500. (Docket Entry No. 87 at 10; Docket Entry No. 47 at 7).

S&P also sought coverage from its insurers.  US Fire refused to issue coverage.  In a letter to the interested parties, US Fire outlined its positions that: (1) the Fungi and Bacteria Exclusion barred coverage for a large portion of all three phases of the award, which, it claimed, flowed primarily from mold damage; and (2) the assessments above the approximately $6 million in actual damages—including for attorney's fees, prejudgment interest, arbitration expenses, and the like—were "supplemental payments" under the policy terms of the primary layer of insurance, and did not count against the primary policy limits.  (Docket Entry No. 87-1, Ex. A-8 at 31-38).  Therefore, US Fire argued, the value of claims potentially covered under its policy was significantly lower than the combined value of the $4.5 million in subcontractor settlements and $1.5 million of the primary layer.  (*Id.* at 38-39).  US Fire also argued that the arbitrators had found that there were multiple "occurrences" within the meanings of the primary policies, and so the primary layer of insurance was not exhausted even if the full property damage award was covered.  (*Id.* at 39-41).

S&P satisfied the arbitration-award judgment with a combination of: the $4,492,500 in subcontractor settlements, approximately $2 million from AGLIC, approximately $1.1 million from Amerisure, and approximately $440,000 from S&P itself.  (Docket Entry No. 87 at 10, Docket Entry No. 47 at 7).

AGLIC paid subject to a reservation of rights that emphasized that it was involuntarily paying amounts greater than its per-occurrence limit in order to protect S&P's interests.  AGLIC left open its asserted right to recoup the overpayment.  (Docket Entry No. 47-4, Ex. A-2) (AGLIC reservation-of-rights letter).

Although Amerisure characterized its payment as a "loan" to S&P, it made the loan on the

condition that it would not seek repayment from S&P. Instead, it could only seek payment from insurance companies that insured S&P but had not paid anything toward the judgment—which appears to mean only US Fire. (Docket Entry No. 76-15, Ex. E-19) (loan agreement).

This action was administratively closed pending the outcome of the arbitration. (Docket Entry No. 14). After the award was paid, it was reopened. (Docket Entry No. 19). AGLIC and S&P filed an amended complaint seeking reimbursement or contribution from US Fire for their payments. (Docket Entry No. 22). The allegations include: (1) a request for declaratory judgment that the arbitration award concerned only one "occurrence" and therefore AGLIC owed $1,000,000 and US Fire owed the rest; (2) a breach of contract claim based on US Fire's failure to pay under its excess policy; and (3) a bad-faith claim under § 541 of the Texas Insurance Code. AGLIC alternatively alleges that it is entitled to reimbursement from Amerisure for part of the amount that it paid for the judgment. AGLIC asks only for a ruling that reallocation is possible, not for a specific amount. AGLIC concedes that the specific amount of damage properly allocated to each policy period is a disputed fact question.

Amerisure filed a complaint in intervention. (Docket Entry No. 31). The Amerisure complaint alleges that its policy was not triggered at all, because S&P selected the AGLIC and US Fire policies for 2006 to 2007 to provide coverage and those amounts together cover the final award. Amerisure also alleges that the damage to the courthouse was a "known loss" excluded from policy coverage because S&P knew about the problems with the courthouse when Amerisure issued the policy. Amerisure argues that it is entitled to contractual and equitable subrogation against US Fire, because Amerisure owed nothing under its policies but nonetheless paid approximately $1.1 million to protect S&P.

The cross-motions are analyzed against the record and the applicable law.

## II.     The Legal Standard for Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United*

*States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

"Once the moving party [meets its initial burden], the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

## III. Arguments and Analysis

### A. US Fire's Liability

The most important issue dividing S&P and the primary insurers from US Fire is how to allocate the $4,492,500 from S&P's subcontractor settlements. The settlement agreements are structured as undifferentiated general releases of all of S&P's claims against the subcontractors. The settlements did not state what specific problem in the courthouse each settlement covered. (Docket Entry No. 91 at 12-13). That is important because the attorney's fees award ($1.5 million), prejudgment interest ($430,458), and arbitration expenses ($29,909.74) are not "damages" that can

be charged to US Fire's excess policy.[1]  It is also undisputed that the "Fungi and Bacteria Exclusion" bars coverage under the US Fire policy for  a large part of the $2.8 million awarded for "Phase I" remediation, which consisted of mold remediation and dome reconstruction.  The arbitrators did not allocate that $2.8 million portion of the award between excluded mold remediation and potentially covered dome-reconstruction work.

Because of these excluded aspects of the arbitration award, US Fire's coverage position—which prompted this lawsuit—is that there is no loss that reaches the excess layer of insurance.  US Fire's logic is as follows.  The arbitration award totaled approximately $8 million.  Subtracting the attorney's fees, arbitration fees, prejudgment interest, and the "Phase I" award from the total leaves roughly $3,240,000 of potentially covered claims.  That is less than the $4,492,500 in subcontractor settlements plus the $1,000,000 that the primary layer of insurance should cover, and significantly less than the subcontractor payments plus the amount that the primary layer *did* cover.  Thus, says US Fire, there is no loss that triggers the excess layer of insurance.  (Docket Entry No. 87 at 12-13).  Unsurprisingly, the other side disagrees.

### a.    The Parties' Contentions

---

[1] Attorney's fees are not damages under Texas law (with exceptions not relevant here).  *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 172-73 (Tex. 2013); *see also Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*, No. CV 4:09-0422, 2016 WL 5539895, at *28 (S.D. Tex. Sept. 29, 2016) (Atlas, J.) (prevailing party attorney's fees under Texas fee-shifting statute were not covered damages).  AGLIC does not make any argument for why attorney's fees are covered under any of the policies, and S&P makes only a halfhearted assertion that the question is "uncertain" under Texas law, and cites a case in which an intermediate Texas court upheld coverage for an arbitration award that included a fee award.  (Docket Entry No. 51 at 25 n.5, citing *Mid-Continent Cas. Co. v. Castagna*, 410 S.W.3d 445, 463–64 (Tex. App.—Dallas, 2013)).  The insurer in *Castagna* does not appear to have argued that attorney's fees were not "damages" within the meaning of its policy or Texas law.  The attorney's fee award was only in dispute because the insurer claimed that it was barred by the policy's exclusion of damages for contract breaches.  The case does not cite or discuss *Nalle* and does not provide any meaningful support for an argument that the attorney's fees are recoverable damages under the relevant policies.  The AGLIC and Amerisure policies both have supplemental payment provisions that designate prejudgment interest and costs taxed against the insured as supplemental payments that do not reduce the limits of insurance.  (Docket Entry No. 47-3 at 16-17 (AGLIC policy); Docket Entry No. 69-4 at 67-68) (Amerisure policy).

S&P does not meaningfully dispute US Fire's basic argument that attorney's fees, arbitration fees, prejudgment interest, and damages for mold remediation cannot be recovered under the US Fire policy. Instead, S&P argues that it is entitled to allocate its subcontractor-settlement money however it likes. Therefore, S&P claims, it *did* suffer a covered loss under the US Fire policy. S&P reasons that it first allocated the subcontractor settlements to cover the Phase I award, attorney's fees, arbitration costs, and prejudgment interest. (Docket Entry No. 51 at 23). S&P concedes that the Phase I mold-remediation damages are not recoverable under the US Fire policy. S&P claims that the portion of Phase I damages for dome and roof repairs and for all other courthouse property damage are recoverable. (*Id.* at 24).[2] S&P's briefs emphasize repeatedly that its subcontractor settlements were not allocated or earmarked for specific building damage. S&P's claims against the subcontractors "alleged that the work of each subcontractor contributed to the construction defects in the Courthouse" and included "contribution, breach of contract, breach of warranty, negligence," and "a cause of action for contractual indemnity based upon the terms of the subcontracts . . . ." (*Id.* at 25).

The core of S&P's argument is that the settlements "have no bearing on the retained limit above which the US Fire coverage is triggered. Thus, the retained limit remains at the $1,000,000 limit of the . . . AGLIC policy that was exhausted." (*Id.* at 27). S&P argues that "[u]nder Texas law, it is the insured that is in the best position to select coverage among multiple insurers," citing *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750 (Tex. 2013). That case states that

---

[2] S&P very briefly asserts that it is "uncertain" whether Texas law makes attorney's fees covered property damage under commercial general liability policies. S&P's primary response on that point is, however, that the issue is irrelevant, because S&P is not seeking reimbursement for attorney's fees (since it allocated settlement funds to cover those fees). (*Id.* at 24-25).

> [i]f a single occurrence triggers more than one policy, covering different policy periods, then different limits may have applied at different times. In such a case, the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest. The insured is generally in the best position to identify the policy or policies that would maximize coverage. Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights.

*Id.* (quoting *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 855 (Tex. 1994)). S&P extends that argument: "[l]ikewise, if an insured such as S&P is in the best position to allocate damages among its own insurance policies, it is logical for it to allocate those damages among recoveries from other parties." (Docket Entry No. 51 at 27-28). S&P does not cite any cases for this extension of the policy-period-selection principle. Instead, S&P seems to argue that because Texas courts allow insureds to select the policy period that maximizes their recovery, the courts would also allow this accounting maneuver, which is also designed to maximize recovery.

S&P argues that its offset theory is in line with Texas equitable principles. S&P refers to the "made whole" doctrine, which applies when an insured has suffered a loss, the insurer has paid its full policy limit, and the party responsible for the loss settles and pays the insured. If the combination of the insurance payment and the settlement payment is less than the loss that the insured suffered, the insurer is not entitled to seek reimbursement from the insured for its payment of its policy limit. The insured's right to be made whole has priority over the insurer's right to seek reimbursement. "An insurer is not entitled to subrogation if the insured's loss is in excess of the amounts recovered from the insurer and the third party causing the loss." *Ortiz v. Great S. Fire & Cas. Ins. Co.*, 597 S.W.2d 342, 343 (Tex. 1980). S&P argues that because the total loss amount exceeded its combined recovery from the subcontractors and its insurers, US Fire stays on the hook.

US Fire argues in response that S&P is not entitled to manufacture a covered loss through the internal bookkeeping maneuver of allocating the settlement money it received only to uncovered harms and then go after insurance coverage for the rest. (Docket Entry No. 87 at 13-14). US Fire then points out that, under Texas law, an insured must prove that its damages are covered by an insurance policy before it is entitled to recover against an insurer. (*Id.* at 15, citing *Employers Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988), *disapproved of on other grounds by State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996)). If covered and uncovered perils together result in a loss, the insured is entitled to recover only the portion caused solely by the covered peril. *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). "Because the insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof. Otherwise, failure to segregate covered and noncovered perils is fatal to recovery." *Id.* (citation omitted). US Fire argues that S&P's position "makes the distinction between covered and uncovered losses meaningless" and "ignores the allocation of risk to which the parties agreed in the insurance policy." (Docket Entry No. 87 at 16). S&P did not purchase insurance that would cover attorney's fees or mold remediation. Therefore, $4.3 million of the final award—the Phase I damages and attorney's fees award together—is totally uncovered by *any* policy at issue in the litigation. S&P should not, on US Fire's account, be allowed to evade the decisions it made through bookkeeping tricks.

US Fire concedes that, to the extent that there is evidence tying a particular settlement payment to an uncovered harm, S&P is entitled to first apply that settlement to the uncovered loss. US Fire stipulates that S&P can apply the $1.75 million settlement by the waterproofing contractor

to offset the mold-remediation award, on the (intuitively sound) premise that the waterproofing contractor's negligent work was the major cause of the mold damage. (*Id.* at 7, 12-13, 16). But, US Fire says, there is no basis in the summary judgment record to allocate any of the other subcontractor settlements to the uncovered attorney's fees or to the remaining portion of the mold-remediation award. There is no basis for S&P to allocate nearly 100% of the settlement money exclusively to uncovered damage. To do so, US Fire argues, impermissibly shifts the risk of an uncovered loss from S&P to US Fire.

S&P's response emphasizes its position that, under the *Lennar Corp./Garcia* rule allowing an insured to choose which policy period to use when one occurrence implicates multiple policy periods so as to maximize its coverage, S&P is justified in allocating substantially all of the settlement money to uncovered losses to maximize its recovery against the policies. (Docket Entry 90 at 13-17). S&P emphasizes that the subcontractor settlements—including the waterproofing-subcontractor settlement—were general releases that did not allocate settlement amounts to specific losses. (*Id.* at 17). Indeed, S&P argues that there is "absolutely no basis to allocate the amount of the subcontractor settlements between covered and non-covered damages . . . ." (*Id.*).

AGLIC's response brief supports S&P, arguing that US Fire's reasoning—that S&P could offset uncovered damages with the settlement funds paid to cover those damages, like the waterproofing-subcontractor settlement—would also justify using the settlement funds to offset other uncovered portions of the award, like attorney's fees. (Docket Entry No. 91 at 11-12). AGLIC characterizes US Fire's argument as "begging the question." The question is whether, if US Fire concedes that the waterproofing settlement was properly allocated to the mold-remediation award, what other settlement amounts are properly allocated to uncovered parts of the award? For example,

all of the releases included a release of attorney's-fees claims. AGLIC argues that S&P was justified in allocating settlement money to cover the full $1.5 million in attorney's fees. (*Id.* at 13). However, AGLIC does not provide any evidence showing what portion of the settlements (if any) was in fact allocated to attorney's fees.

In response to this argument, US Fire points out that S&P and AGLIC have not provided any evidence showing that any specific portion of the remaining subcontractor settlements was in fact allocated to the damages that make up the uncovered portions of the award. US Fire emphasizes that a party with the burden of proof cannot avoid summary judgment by speculating about what unidentified evidence might prove. (Docket Entry No. 92 at 9-10). US Fire also filed a supplemental brief noting several Fifth Circuit cases that, although they do not squarely address this fact pattern, nonetheless provide support. The most important of these is *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1494-95 (5th Cir. 1992), *as clarified on denial of reh'g* (Mar. 9, 1992), in which Judge Wisdom held that, if an insured settles a claim that potentially includes liability for both covered and uncovered activity, in a suit against the insurer for indemnification, the insured has the burden of demonstrating what portion of the settlement it paid was properly allocated to covered as opposed to uncovered damages.

Each set of arguments is analyzed below.

### b. Analysis

S&P's "offset" theory is not supported by the caselaw it cites or that the court's own research has uncovered. S&P chose not to insure a substantial portion of the risk it carried as the general contractor for this large construction project. Now, after it has suffered an adverse judgment that encompassed both covered and uncovered risks, S&P seeks to leave its insurers on the hook for risks

they did not agree to insure. This theory is not only lacking in case support, it would produce an unfair result.

The only caselaw that S&P cites is the *Lennar Corp./Garcia* rule that allows an insured to select which policy period to activate. But that rule is not applicable here. The issue here is whether an insured can round up general settlements from its subcontractors, unilaterally decide that they will be allocated to uncovered damages, and then go after the insurers that would cover the damages if the loss was properly allocated to that policy. The concurrent-cause cases that US Fire cites strongly suggest that, in cases involving both covered and uncovered damages, Texas courts generally put the burden on the insured to identify the portion of a liability or loss that was produced by a covered condition. The rule "is not an affirmative defense or an avoidance issue; instead, it is a rule embodying the basic principle that insureds are not entitled to recover under their insurance policies unless they prove their damage is covered by the policy." *Comsys*, 130 S.W.3d at 198.

The rule in *Enserch* and the related cases that US Fire cites reach the same result. The Fifth Circuit, applying Texas law, regularly places the burden of allocating between covered and uncovered damages on the insured in situations that raise issues broadly similar to this case. These cases do not specifically address allocating a layer of settlement proceeds that an insured *received* as compensation for both covered and uncovered damages. But these cases strongly support holding, on these facts, that it is the insured's burden to show that it has not already been compensated for the covered loss by settlement money it has received from the parties responsible for the damages in the first place.

A case that the parties did not cite or discuss, *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851 (5th Cir. 2010), strongly supports US Fire's contention that S&P cannot unilaterally allocate all of its

settlement proceeds to uncovered losses in order to manufacture a covered loss. In that case, RSR's subsidiary operated a lead smelter on Harbor Island, outside Seattle. *Id.* at 854. International Insurance Co.'s predecessor in interest issued several environmental policies to RSR that covered the Harbor Island facility. *Id.* at 854-55. The policies had "other insurance" clauses stating that the International policies were excess to any amounts collectible under other policies. *Id.* at 855. RSR also had CGL policies from many other insurers that covered multiple sites, including the Harbor Island facility. *Id.* The federal EPA began investigating the Harbor Island facility in 1982 and sued under CERCLA in 2000. *Id.* at 854. Shortly after the EPA filed suit, International filed a declaratory judgment action in federal court, urging that it owed nothing for the Harbor Island environmental remediation damages. *Id.* at 856. In 2001, RSR and International tried various coverage issues to a jury. That trial resulted in a declaratory judgment that International had to indemnify RSR for the costs to remediate the Harbor Island site to the extent that the International policies covered the costs and did not exclude them. *Id.* The Fifth Circuit affirmed in 2005.

Meanwhile, back in 1993, RSR had sued 53 of its CGL insurers for their refusal to cover the environmental-cleanup costs at dozens of sites, including Harbor Island. *Id.* at 855. That litigation lasted for over a decade. Between 1993 and 2005, RSR entered into general-release-of-claims settlements with 36 of its CGL insurers, for a total of $76 million. *Id*. at 856. RSR dismissed the rest of the action. *Id.*

In 2006, RSR moved to reopen the federal case, and the parties raised a host of new coverage issues. In relevant part, International argued that the "other insurance" clauses made its policies excess, and that the $76 million in unallocated CGL settlements precluded coverage because RSR had already been fully compensated for the approximately $13 million in Harbor Island remediation

costs.  In the alternative, RSR argued that even if the CGL settlements were not "other insurance,"
the Texas "one satisfaction" rule precluding a plaintiff from recovering more than its total losses
prevented RSR from recovering.  *Id.* at 856-57.

The district court ruled for International on both issues.  RSR appealed, arguing: (1) that the
"other insurance" clauses did not apply, meaning that International's policy was primary, not excess;
and (2) that the "one satisfaction" rule applied only in tort cases.  *Id.* at 857.  The Fifth Circuit held
that the "other insurance" clauses meant that the International policy was excess to any other
recoveries.  The question then became "whether or not the CGL settlements compensated RSR fully
for its Harbor Island liabilities."  *Id.* at 861.  At this point, the arguments become familiar:

> RSR argues that it was not fully compensated for these liabilities by the CGL
> settlements. International responds that, even if this were true, it was RSR's burden
> under Texas law to allocate the settlement proceeds. Because RSR failed to do this,
> International argues that Texas law presumes that the full amount of the CGL
> settlements must be allocated to liabilities that would also be covered under the
> Environmental policies. International collected over $76 million from its settlements
> with the CGL insurers. It only seeks $13.1 million from International for its Harbor
> Island liabilities. Therefore, if International is correct about Texas's presumptive
> allocation, then there is no excess to be covered under Condition 8, and we must
> affirm the district court's take-nothing judgment.

*Id.*

The Fifth Circuit noted that, while the Texas Supreme Court had not confronted this precise
issue, its opinion in *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917 (Tex. 1998), strongly suggested
an answer.

> In *Ellender*, the family members of an independent contractor who died from
> exposure to benzene sued multiple parties whom they believed were responsible for
> his death. *Id.* at 920. All of the defendants except Mobil settled. *Id.* The jury returned
> a verdict for the plaintiffs. *Id.* At issue on appeal was the proper amount of the
> settlement credits that had to be subtracted from this verdict. *Id.* at 926. Specifically,
> the Supreme Court of Texas had to determine which side bore the burden of
> allocating the settlement amounts between actual and punitive damages. *Id.*

The court began its analysis of the issue by noting that "settling plaintiffs are in a better position than nonsettling defendants to insure that the settlement award is allocated between actual and punitive damages." *Id.* at 928. It expressed concern that "[w]ithout an allocation, Mobil, who was not a party to the settlement, had almost no ability to prove which part of the settlement amount represented actual damages. Nonsettling parties should not be penalized for events over which they have no control." *Id.* It then examined the hazards inherent in the opposite rule:

> "When the settlement agreement does not allocate between actual and punitive damages, requiring a nonsettling party to prove the agreement's allocation before receiving a settlement credit not only unfairly penalizes the nonsettling party but also allows settling parties to abrogate the one satisfaction rule . . . . Settling parties could prevent nonsettling parties from receiving settlement credit by refusing to allocate between actual and punitive damages in settlement agreements . . . . The better rule is to require a settling party to tender to the trial court, before judgment, a settlement agreement allocating between actual and punitive damages as a condition precedent to limiting dollar-for-dollar settlement credits to settlement amounts representing actual damages." *Id.*

The court concluded that, where a settling party failed to allocate its settlement, the nonsettling party was entitled to a credit equaling the entire settlement amount. *Id.*

*RSR Corp.*, 612 F.3d at 861-62.

The Fifth Circuit concluded that *Ellender* governed. Of critical importance was the fact that, "[j]ust as the lack of an allocation could have led to a double recovery in *Ellender*, the lack of allocation could lead to a double recovery respecting the Harbor Island liabilities in this case." *Id.* at 862. RSR argued that *Ellender* did not apply, because it was based on the "one satisfaction" rule, which applies only in the tort context. *Id.* The Fifth Circuit rejected that argument, reasoning that *Ellender*'s holding that the plaintiff had the burden to resolve the uncertainty created by general-release settlements that included both covered and uncovered damage applied generally, and not only to the "one satisfaction" rule in tort law. Indeed, courts frequently hold that parties with specialized knowledge of a particular underlying fact have the burden of proving it. *Id.* RSR had

no evidence to show that its CGL settlements were properly allocated to uncovered liabilities (that is, to sites other than the Harbor Island site). Therefore, the appellate court reasoned, the district court correctly entered a take-nothing judgment. The settlements "yielded over $76 million in proceeds, all of which must be allocated to the Harbor Island liabilities before RSR could collect on its Environmental policies. Because the Harbor Island alleged liabilities only totaled $13.1 million, RSR can take nothing under the [International] policies." *Id.* at 862-63.

*RSR* is closely analogous to the current facts. As in the present case, the insured was liable for a variety of damages, some covered under an excess policy and some not covered. The insured entered into general-release settlement agreements for more than the potentially covered damages under the policy. The insured then sought coverage from its excess insurer for the covered amount. The insurer refused to pay, on the ground that the insured had already received more money in settlements than it could have recovered under the policy. The Fifth Circuit sided with the insurer, reasoning that it was the insured's responsibility to demonstrate what portions of the settlements were for covered liabilities and which were not. Absent that showing, the settlements were presumptively for covered claims, meaning that the plaintiff could not recover.

The only potential distinction is that, in *RSR*, the undifferentiated settlements were with the primary layer of liability insurance, rather than with subcontractors responsible for the work that produced the various liabilities. That distinction is without a difference. In both circumstances, the insured suffered a partially covered loss, received a bucket of undifferentiated money to cover the loss, and then tried to recover on an excess policy, arguing that it did not have to apply the settlement money to the covered loss. The *RSR* court's reasoning in the relevant portion of the opinion does not turn on the fact that the settlements were insurance settlements. (The portion of

18

the opinion in which the court decided whether the "other insurance" clause was effective *does* make much of the fact that the settlements were with other insurance companies; that is not relevant when, as here, the US Fire policy is clearly an excess policy.) The court's reasoning in the final portion of the opinion—the relevant portion for present purposes—would read the same way if the settlements were, as in this case, from subcontractors who created the relevant liability. Additionally, *Ellender* itself did not involve a settlement with a primary CGL insurer.

In a supplemental brief, S&P and its primary insurers argue that *RSR* is distinguishable because, in this case, US Fire was not at a disadvantage due to lack of information about the settlement processes. S&P urges that US Fire consented to "any reasonable settlement" and therefore cannot argue that S&P is not entitled to coverage because of how it chose to allocate the settlement payments as between covered and uncovered losses. (Docket Entry No. 103 at 9-11). Even if it is true that, in this case, US Fire had relatively more information about the underlying litigation and settlement process than International did in *RSR*, S&P did, and US Fire did not, have the power to structure its subcontractor settlements to ensure a clear allocation of the settlement proceeds by specifying which amounts were for covered damages and which amounts were for uncovered damages. S&P chose not to do so. The *RSR* rule applies.

The court finds and concludes that, under *RSR*, S&P was not entitled to manufacture a double recovery by after-the-fact allocation of its subcontractor settlements to uncovered damages. S&P had the burden of demonstrating that the settlements it was paid did not fully compensate its covered damages by providing evidence of what portion of the settlements compensated for what harm. The issue is whether S&P has satisfied its summary judgment burden by pointing the court to competent record evidence creating a factual dispute material to deciding the settlement-allocation issue. S&P

has not.

In its opening brief, S&P affirmatively represented that the settlements were structured as undifferentiated general releases that were not earmarked to any particular damage; that there was no reason for it to have structured the settlements to allocate between covered and uncovered damage; and that it was not possible to allocate the settlement proceeds between covered and uncovered damage. (Docket Entry No. 51 at 25-26). S&P doubled down on that position in a response brief, insisting that there was "*absolutely no basis* to allocate the amount of the subcontractor settlements between covered and non-covered damages . . . ." (Docket Entry No. 90 at 17) (emphasis added). S&P confirmed at oral argument that "no settlement was actually earmarked for a particular scope of work." (Docket Entry No. 100 at 6). It was only after the motion hearing, at which the court stated its concern that S&P's double-recovery theory was untenable, that S&P made this *volte-face*.

In a supplemental brief, S&P revealed its discovery that, contrary to its earlier representations, the record shows that several subcontractor settlements were in fact specifically for uncovered damages. S&P then argued that, in addition to the waterproofing subcontractor, whose $1.75 million settlement US Fire stipulated is allocated to uncovered mold damage, the record reflects that two additional subcontractors' work may have caused the mold damage. S&P argues that these settlements should be allocated to mold remediation. S&P asserts that the $100,000 settlement with its HVAC subcontractor and the $575,000 settlement with its window-installation subcontractor "could potentially be used" to "satisfy the portion of the award for mold remediation damages." (Docket Entry No. 103 at 11-12). AGLIC's summary judgment brief also noted that S&P's $37,500 settlement with its wallpaper subcontractor might also be allocated to mold

20

remediation, because the wallpaper contributed to the mold problem. S&P also argues that, because each release agreement specified that it also covered any claim for liability for related attorney's fees, "some portion of the amounts paid by the subcontractors must have been for the attorney's fees recovered by Zapata County" and not covered by insurance. (*Id.* at 14).

S&P is not entitled to allocate any of the subcontractor-settlement proceeds—save for the $1.75 million waterproofing settlement that US Fire stipulated could be earmarked for mold damages—to the damage categories that it did not buy insurance to cover. S&P and its primary insurers have not pointed the court to record evidence sufficient to discharge their summary judgment burden of showing what portion of what settlement was for uncovered damages. S&P's burden was to present summary judgment evidence from which a factfinder could determine what portion of a specific subcontractor settlement reimbursed S&P for a specific uncovered loss. Merely showing that some unspecified portion of a settlement may have had something to do with an uncovered loss does not meet an insured's burden to demonstrate a covered loss. And that is all that S&P's new evidence and arguments show—that there is potentially some connection between the HVAC, window-installation, and wallpaper settlements and the uncovered mold-remediation damage. S&P does not identify any record evidence from which a factfinder could determine what portion of the settlement was paid to reimburse S&P for the mold-remediation damage.[3]

_____

[3] S&P appears to argue that, because US Fire stipulated that the full value of the waterproofing-subcontractor settlement could be earmarked for uncovered mold-remediation damage, it can demonstrate a fact question as to the allocation of the full dollar value of any settlement with some connection to mold damage. Not so. Absent US Fire's stipulation on the waterproofing-subcontractor settlement, the court would have also found that S&P failed to carry its summary judgment burden as to that settlement as well. S&P presented no evidence from which a factfinder could determine what specific portion of its settlement with its subcontractor should properly be allocated to covered versus uncovered damages. US Fire's stipulation on that settlement excuses S&P from its obligation to make that showing, but the stipulation does not affect the analysis on any other settlement.

The subcontractor settlements released attorney's-fees claims in boilerplate releases of all categories of damages. The releases were for "all claims, debts, demands, obligations, liabilities, suits, liens, rights, offsets, and causes of action of whatsoever nature for actual damages, additional damages, exemplary damages, punitive damages, consequential damages, interest, costs of court, and attorney's fees, based or sought upon any legal theory whatsoever . . . ." (Docket Entry No. 103 at 13). This is not a sufficient basis to survive summary judgment on the attorney's fees issue. S&P's new evidence—an affidavit from the attorney who organized the subcontractor settlements, stating that S&P considered attorney's fees as part of its settlement valuation—was sworn to over a month after the summary judgment hearing and six months after the close of discovery. This is too late to be considered and unpersuasive in any event. Summary judgment is not an iterative process, with the parties presenting new arguments and evidence in piecemeal fashion, after learning that their initial strategy did not pan out. Even if this evidence was properly presented, and considered, it is not sufficient: it would not allow a factfinder to determine what portion of each settlement is properly allocated to attorney's fees. The affidavit merely states that its settlement demands "took into account" attorney's fees as well as various other non-damage categories.

Even if S&P was correct on the merits on this issue, and it is not, the court still would not rule in its favor. Equitable principles weigh heavily against allowing S&P to benefit by reversing its previous position. As a result of S&P's strategic decision to characterize the subcontractor settlements as a pool of money with which it could do whatever it liked, its opening briefs repeatedly emphasized that all of its settlement agreements were general and undifferentiated, and that it could not show what portion of what settlement amount was properly allocated to covered and what portion to uncovered damages. (Docket Entry No. 51 at 25-26; Docket Entry No. 90 at 17). S&P's

newfound position that the record demonstrates close connections between many of the settlements and uncovered damage categories is disingenuous. Further, S&P did not even raise this set of arguments in a reply brief, and instead only presented this theory in a supplemental brief filed after it became clear that the court did not find S&P's efforts to generate a double recovery persuasive. Arguments raised for the first time in reply briefs are forfeited. *E.g.*, *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008).

S&P has not shown a factual dispute material to deciding what portions of the settlement payments that it received were for covered damages and which were for uncovered damages. S&P did not show that allocation was possible. It is not entitled to after-the-fact allocate the settlement proceeds to uncovered damages (save for the stipulation as to the settlement with the waterproofing subcontractor). S&P's subcontractor settlements exceeded the total value of its covered losses, and so S&P cannot recover against US Fire. S&P's primary insurance coverage plus the settlements fully compensated for the insured losses.

The court's resolution of this issue moots many of the other issues. S&P's claim for bad-faith damages under Chapter 541 of the Texas Insurance Code and Texas common law fails, because S&P was not entitled to recover against the US Fire policy. The court does not need to determine whether the underlying arbitration award stemmed from one occurrence or from multiple occurrences under the primary policies, because even assuming that there was only one occurrence (S&P and the primary insurers' position), there is no covered damage that extends to the excess layer. The court need not rule on US Fire's argument that the "Your Product" exclusion in its policy bars coverage, because S&P cannot recover against that policy in the first place.

On the issue of US Fire's liability, S&P and the primary insurers' motions are denied and

US Fire's motion is granted.

## B.    Amerisure's liability

AGLIC and Amerisure separately dispute the allocation of costs within the primary layer of insurance.  While the dispute is mooted in part by the court's determination that S&P cannot recover against the US Fire policy, the briefs suggest that there is still a live controversy as to what part of the primary layer of insurance is covered by AGLIC and which part by Amerisure.[4]  Each argues that it paid more than it had to and is owed money by the other primary insurer.

Amerisure moved for summary judgment that the arbitration award did not trigger its policy. The core of this dispute is the "Known Loss" exclusion in the Amerisure policy.  The exclusion bars coverage for harms if, "[p]rior to the policy period, no insured listed under Paragraph 1.  Of Section II – Who Is An Insured and no 'employee' authorized by you to give or receive notice of an 'occurrence' or claim, knew that the . . . 'property damage' had occurred, in whole or in part." (Docket Entry No. 69-2 at 22).  The policy also excludes "continuation, change or resumption" of these preexisting losses.  (*Id.*).

AGLIC and Amerisure disagree on who had to know of a problem for the "Known Loss" provision to bar coverage.  AGLIC points to the policy's definition of an insured, which says that, for a corporation, "you are an insured.  Your 'executive officers' and directors are insureds, but only with respect to their duties as your officers or directors.  Your stockholders are also insureds, but only with respect to their liability as stockholders."  (Docket Entry No. 84 at 9).  Invoking the principle that contracts must be interpreted in a way that gives meaning to every term, AGLIC

---

[4]  The primary insurers cannot recover against US Fire under the familiar principle that an insurer with a subrogated claim steps into the shoes of its insured; the insurer has no greater right than the insured.  Here, the insured—S&P—has no right of recovery against US Fire.

argues that the fact that the definition includes "you"—S&P itself—as an insured does not mean that notice to anyone associated with S&P is enough. If notice to anyone associated with S&P was sufficient, then the phrases "any insured listed under Paragraph 1" and "no 'employee' authorized by you to give or receive notice of an 'occurrence' or 'claim'" would be meaningless. The policy could have simply excluded any loss of which "you"—S&P—had knowledge. AGLIC argues that to trigger the "Known Loss" exclusion, Amerisure must show that S&P's executive officers, directors, stockholders, or employees authorized to give or receive notice under the Amerisure policy were aware of the loss. (*Id.* at 10). Amerisure responds by pointing to the fact that S&P itself is listed as an insured in the relevant section. Amerisure concludes that any knowledge that the company itself had triggered the exclusion. (Docket Entry No. 89 at 5).

Amerisure is correct that S&P is listed as an insured in the relevant portion of the policy, and so "S&P's" knowledge must be sufficient. However, this does not mean that any notice to anyone involved with S&P in any fashion is enough. Agency-law principles govern. Both sides cite cases discussing agency-law principles used to determine when a corporation "knows" a fact. (Docket Entry No. 84 at 10; Docket Entry No. 89 at 5). "A corporation can act and acquire knowledge only through its agents." *Poth v. Small, Craig & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.—Austin 1998, pet. denied). Knowledge is imputed to a corporation when the agent is acting in the scope of his or her authority and the knowledge relates to matters within the scope of that authority. *E.g.*, *In re Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir. 2001) (cited by AGLIC); *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008) (cited by Amerisure); RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed

to the principal if knowledge of the fact is material to the agent's duties to the principal . . . ."). AGLIC's proposal to limit that category of agents to high-level executives is not supported by the cases or the policy language it cites. It does not follow that notice to anyone connected to S&P is enough. AGLIC's limit is simply too narrow.

Even though AGLIC's argument from the policy language fails, summary judgment in Amerisure's favor is not proper. Amerisure's core argument is that S&P had notice of all of the problems at the courthouse before the first Amerisure policy period began on December 31, 2007. Amerisure's argument is based on various complaints that Zapata County made to S&P over the first few years that the courthouse was in use. These complaints mostly came through the construction closeout process or during the warranty period, when S&P was obligated to fix problems with the building. Amerisure bases its argument on detailed references to dozens of documents and testimony from depositions and arbitration. AGLIC responds with its own lengthy and record-heavy factual rebuttal, frequently challenging Amerisure's characterizations of various statements or documents or arguing that the inferences that Amerisure draws from various pieces of evidence are inaccurate, and drawing contrary inferences.

Amerisure's motion for summary judgment is denied because it has not pointed to or presented summary judgment evidence of undisputed facts proving as a matter of law that the "Known Loss" exclusion applies. Amerisure's evidence does not show that the various complaints that the County lodged in 2005 to 2007 have anything to do with the ultimate arbitration award. Even if Amerisure's factual recitation is correct—and AGLIC contests Amerisure's account in detail—the evidence does not tie the 2005 to 2007 complaints to the arbitration award.

Viewing the record evidence in the light most favorable to AGLIC, the nonmoving party on

this issue, the problems reported from 2005 to 2007 were relatively minor and isolated. S&P believed its repair efforts had wholly remedied the problems. (Docket Entry No. 84-5, Ex. F3 at 7-8) (project manager Alejandro Gomez deposition testimony). The evidence does not compel the inference that S&P knew before the Amerisure policy period began that the overall construction of the courthouse was fundamentally flawed and that major structural changes were needed, as the arbitration panel ultimately found.

Amerisure effectively fails to respond to AGLIC's argument. The last two pages of Amerisure's reply brief assert in conclusory fashion that "the recurring and intensifying nature" of the problems should have led S&P to realize that the courthouse problems were systemic and structural and could not be fixed by isolated repairs. (Docket Entry No. 89 at 8). Amerisure then characterizes AGLIC's argument as an objection to Amerisure's use of the arbitration panel's damage categories. Amerisure argues that it is enough to show that the courthouse problems were in the same general categories that the panel used in its award. But AGLIC does not argue that Amerisure has to show that S&P was aware of precisely the construction problems—the exact leaks or mold spots—that formed the basis of the arbitration award. Rather, AGLIC's argument is that Amerisure's evidence does not show that S&P was aware of major structural problems with the courthouse construction that gave rise to the complaints in 2005 to 2007 *and* to the complaints in 2010 that eventually led to the underlying lawsuit. Amerisure's reply motion does not attempt to connect the pre-policy period damages to the structural problems that the arbitration award was based on.

AGLIC also disputes, at a minute level, every category of damage notice that Amerisure puts forward in its brief. Its arguments are accompanied by detailed record citations. As AGLIC's brief makes clear, this set of disputes cannot be resolved on summary judgment. Amerisure says that S&P

was aware of mold issues as of 2005. (Docket Entry No. 69-2 at 15). AGLIC points out that there is no necessary link between the 2005 mold and the mold that was the subject of the arbitration award; further, it argues that S&P fixed the 2005 mold problem. (Docket Entry No. 84 at 18). Amerisure says that S&P knew about structural problems with the dome from notifications of leaks near the dome, damaged light fixtures, and broken roof shingles. (Docket Entry No. 69-2 at 16).[5] AGLIC points out that the arbitration award related to major structural problems with the dome that required a full 2011 engineering investigation to discover (meaning that notice of a few leaks was insufficient to put S&P on notice of the ultimate liability). AGLIC also contests Amerisure's characterization of several pieces of evidence on the dome issue. (Docket Entry No. 84 at 18-20). Amerisure says that S&P knew about problems with the roof beginning in 2006, pointing to requests for S&P to come fix roof leaks. (Docket Entry No. 69-2 at 16-17). AGLIC responds that the award for roof repair was for damage that was not discovered until the 2011 engineering investigation, and that in September 2007 (after the leak incidents Amerisure cites) S&P received an inspection report that graded the roof in "good" condition. (Docket Entry No. 84 at 20-22). Amerisure says that S&P was aware of problems with leaking windows, cracked terrazzo tile, and HVAC issues before its policy period began. (Docket Entry No. 69-2 at 17-19). AGLIC responds that these were isolated and minor incidents, and that the structural issues behind the arbitration award were not discovered until the 2011 engineering investigative report. (Docket Entry No. 84 at 22-27). All of these factual

---

[5] Amerisure also points to arbitration testimony that it characterizes as S&P admitting that it had notice of broad water-intrusion problems, including dome leaks. (*Id.* citing Docket Entry No. 76-6, Ex. E10). The cited portions reference roof leaks in 2006 and knowledge of water intrusion in 2005 or 2006, but the exhibit is a disorganized and poorly labeled assortment of 24 pages from the arbitration transcript, ranging from page 98 to 1788. The pages have dates in the top right corner (which might represent what day the relevant portions of testimony occurred on) ranging from January 11, 2016 to January 20, 2016. It appears that the excerpts contain the testimony of several different witnesses, but the witnesses are not identified on the top of the pages, or through other annotations. In short, it is not competent summary judgment evidence.

disputes are backed with record citations or responsive argument designed to show that the other side's record support is inadequate or mischaracterized.

Amerisure has not met its burden of demonstrating that there is no genuine factual dispute and that it is entitled to judgment in its favor as a matter of law. AGLIC has pointed to facts and inferences that, if true, would conflict with the facts Amerisure points to and its argument that S&P knew about all of the damage before the Amerisure policy period. Summary judgment on the "Known Loss" exclusion issue is improper.

## IV.    Conclusion

US Fire's motion for summary judgment is granted in substantial part. S&P and the primary insurers are not entitled to recover from US Fire, because S&P did not meet its summary judgment burden of demonstrating a factual dispute material to deciding whether it suffered a covered loss. The rest of the issues presented in the briefing on that portion of the case are moot given the court's determination that US Fire is not liable to S&P. Amerisure's motion for summary judgment that its policy was not triggered by the arbitration award due to the operation of the "Known Loss" provision is denied.

No later than **July 7, 2017**, the parties must confer and submit two documents. The first is a proposed form of judgment dismissing the claims against US Fire, with prejudice. The second is a joint statement from the remaining parties—S&P, AGLIC, and Amerisure—on what steps remain to resolve the disputes over the allocation of costs within the primary layer of insurance. If the parties disagree on the steps, the statement should outline their positions. The parties must appear for a status conference on **July 17, 2017** at 9:30 a.m. If summer plans make that date unworkable, the conference is set for **August 14, 2017**, at 8:30 a.m. No later than **June 9, 2017**, all counsel must

advise the court as to whether the July 17 setting is feasible given their summer plans.

SIGNED on June 1, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge