# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
August 2, 2018
Lyle W. Cayce
Clerk

No. 17-20513

SATTERFIELD AND PONTIKES CONSTRUCTION, INCORPORATED,

Plaintiff - Appellant

AMERISURE MUTUAL INSURANCE COMPANY,

Intervenor - Appellant

United States District Court
Southern District of Texas
FILED
AUG 2 4 2018
[illegible], Clerk of Court

v.

UNITED STATES FIRE INSURANCE COMPANY,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before CLEMENT, HIGGINSON, and HO, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Satterfield and Pontikes Construction, Inc. (S&P), a general construction contractor, sued United States Fire Insurance Company (U.S. Fire), its secondary insurance provider, after U.S. Fire refused to cover damages S&P incurred when a courthouse construction project went awry. U.S. Fire argued that it could not determine whether the funds S&P recovered from subcontractors of the courthouse project went to damages covered under U.S. Fire's policy because S&P failed to allocate those proceeds when settling with

the subcontractors. If the subcontractor settlements were used to pay for damages covered under U.S. Fire's policy, then allowing S&P to collect under U.S. Fire's policy would result in double recovery and unjust enrichment. The district court granted summary judgment in favor of U.S. Fire after it determined that S&P failed to meet its burden to show allocation of the settlement proceeds between covered and noncovered damages. We affirm.

## FACTS AND PROCEEDINGS

S&P was hired as the general contractor for a courthouse building project by Zapata County, Texas. S&P, in turn, hired numerous subcontractors to perform various roles for the construction. The project was large and required several years of work.

S&P purchased two "layers" of insurance to cover potential liabilities that could arise from the project. The first layer comprised commercial general liability insurance policies from American Guarantee and Liability Insurance Company (AGLIC) and Amerisure Mutual Insurance Company (Amerisure).[1] AGLIC's policy spanned from 2006–2007, and Amerisure's policies spanned from 2007–2011. AGLIC's policy had a per-occurrence limit of $1,000,000 and an aggregate limit of $2,000,000. S&P also purchased a second layer of insurance from U.S. Fire that would kick in only when the first layer of insurance was depleted. This policy had a $25,000,000 limit. S&P also required its subcontractors to purchase insurance and sign indemnity agreements to cover damage they caused to the project.

But S&P's coverage was not all-inclusive. The policy it purchased from U.S. Fire barred coverage for any "property damage" resulting from exposure to fungi, including mold, or bacteria. AGLIC's policy contained similar

[1] S&P also purchased insurance from Zurich American Insurance Company.

exclusions. And U.S. Fire's policy did not cover attorney's fees or other legal costs.[2]

The project did not go well. Zapata County eventually terminated S&P and retained new contractors to complete the construction. Zapata County sued S&P, and the parties arbitrated their dispute.

The arbitration panel found that "S&P failed to build the courthouse in a good and workmanlike manner." "S&P also failed to properly supervise its subcontractors." And because of S&P's failures, "the courthouse suffered physical harm and damage."

Determining that the damage S&P caused required significant repairs, the arbitration panel awarded Zapata County $2,800,000 for mold remediation and dome reconstruction,[3] $855,000 for replacement of the courthouse roof, and $2,417,000 for fireproofing replacement, terrazzo/window repairs, and cleaning. The panel further awarded $430,458 in prejudgment interest to Zapata County, $1,500,000 for reasonable attorney's fees, and some of the arbitration costs. In total, the final award was $8,032,367.74.[4]

S&P included its subcontractors in the arbitration, seeking money pursuant to the indemnification clauses in the subcontracts. S&P informed U.S. Fire of its efforts to settle with the subcontractors, and U.S. Fire said in an email that it would not object to any "reasonable settlement." S&P then entered into settlement agreements with fifteen subcontractors and two third parties, collecting $4,492,500 for its efforts. These settlements were complete

---

[2] Under Texas law these costs are not damages. *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 172–73 (Tex. 2013).

[3] Although the arbitration award divides this amount between mold remediation and reconstruction of the courthouse's dome, both parties attribute the award entirely to damage caused by mold not covered by U.S. Fire's policy. The district court noted that the arbitrators did not allocate the award between these damages.

[4] By the time S&P paid the award, the post judgment interest had increased it to $8,063,641.78.

releases of liability, but the agreements did not allocate the proceeds of the settlements to the damages/liabilities they covered.

Of course, the $4,492,500 was not nearly sufficient to cover the $8,032,367.74 arbitration award. S&P was obliged to draw on its insurance policies to make up the $3,571,141.78 shortfall. S&P chose the AGLIC policy (which covered liabilities from 2006–2007) to cover the damages. AGLIC paid $1,985,604.63 to help satisfy the award, which it claimed was an amount in excess of its obligations under the policy. But AGLIC's money in conjunction with the subcontractor settlements—which together totaled $6,478,104.63—failed to cover the arbitration award. S&P turned to U.S. Fire, its excess insurance provider, to cover the remainder. U.S. Fire paid nothing, arguing that the first layer of insurance for covered damages had not been completely exhausted. Amerisure—although it believed U.S. Fire was obligated to pay the shortfall—paid $1,146,405.10 to help satisfy the arbitration award. Despite these payments from AGLIC and Amerisure, S&P was required to spend $439,131.98 to satisfy the balance of the award.

S&P and AGLIC[5] sued U.S. Fire, claiming that the excess insurer breached its policy.[6] Amerisure intervened, seeking equitable subrogation for the amount that it contributed.

Both sides moved for summary judgment. S&P's argument was simple: U.S. Fire, as its second layer insurance provider, was required to make up the shortfall after the first layer of insurance was exhausted. Approximately $4,500,000 of the $8,000,000 award that S&P owed to Zapata County was satisfied by the subcontractors. And AGLIC should have paid roughly $1,500,000 of the arbitration award ($1,000,000 for one occurrence plus

[5] AGLIC originally joined this appeal, but has since dismissed it.

[6] The parties filed many other claims against each other that are not relevant to this appeal.

prejudgment interest, post-judgment interest, and other fees). That left a shortfall of roughly $2,000,000 that U.S. Fire should have paid.

U.S. Fire contended that S&P's argument ignores that not all of the damages awarded by the arbitration panel were covered under its insurance policy—including the mold remediation award ($2,800,000), the attorney's fees award ($1,500,000), the prejudgment interest award ($202,320.53), and the arbitration fees ($29,909.74). Once these sums, along with AGLIC's $1,000,000 first layer of insurance, are removed from the $8,000,000 arbitration award, then no more than $2,500,000 was potentially recoverable from U.S. Fire.

Of course, simply because roughly $2,500,000 of the damages were covered under its policy does not mean that U.S. Fire believed that it was obligated to pay that amount. After determining which damages were potentially covered, U.S. Fire looked to the $4,492,500 subcontractor settlement award and considered whether the proceeds applied to covered or noncovered damages under its policy. The waterproofing subcontractor, whose work probably caused the mold damage, paid $1,750,000 to settle S&P's claims against it. U.S. Fire stipulated that this amount could be allocated to the uninsured mold damages. So $1,750,000 of the $4,492,500 subcontractor settlement award applied to the noncovered damages. U.S. Fire contended that the remaining $2,742,500 of the subcontractor settlement award applied to the covered damages that S&P sought to recover from U.S. Fire. That amount was greater than the $2,531,411.51 of potentially covered damages, and so there was no shortfall for U.S. Fire to pay. Allowing S&P to recover from both the subcontractors and U.S. Fire for the same damages would result in double recovery and unjust enrichment.

Before the district court, S&P initially contended that it was entitled to allocate its subcontractor settlement money however it liked. S&P repeatedly emphasized that its subcontractor settlements were not allocated or

earmarked for specific building damage. So the settlements could either go to the damages that were covered under U.S. Fire's policy or they could go to the noncovered damages (mold, attorney's fees, etc.). Eventually, S&P changed its position and argued that the subcontractor settlements were allocated between covered and noncovered damages.

The district court granted summary judgment in favor of U.S. Fire, reasoning: "S&P chose not to insure a substantial portion of the risk it carried . . . [and now] seeks to leave its insurers on the hook for risks they did not agree to insure. This theory is not only lacking in case support, it would produce an unfair result." The district court relied heavily on a case that the parties did not cite or discuss, *RSR Corp. v. International Insurance Co.*, 612 F.3d 851 (5th Cir. 2010), for the proposition that "S&P cannot unilaterally allocate all of its settlement proceeds to uncovered losses in order to manufacture a covered loss." Drawing on principles from the case law, the district court placed a burden on S&P to demonstrate that the settlement proceeds could be allocated to the noncovered portions of U.S. Fire's policy. S&P was unable to show that any settlement proceeds (other than the $1,750,000 from the waterproofing subcontractor) could be allocated to the noncovered damages.

Although S&P eventually attempted to demonstrate that the record indicated close connections between many of the subcontractor settlements and damages not covered by U.S. Fire's policy in supplemental briefing, the district court found these contentions unpersuasive and untimely. It concluded that S&P had failed to raise a factual dispute capable of frustrating an award of summary judgment to U.S. Fire.[7]

---

[7] Awarding summary judgment to U.S. Fire led the district court to conclude many of the other issues were moot, including: S&P's claim for bad-faith damages under the Texas Insurance Code and common law, whether the underlying arbitration award stemmed from

## STANDARD OF REVIEW

We review an award of summary judgment de novo, applying the same standard as the district court. *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co.*, 876 F.3d 119, 127–28 (5th Cir. 2017). A genuine dispute as to any material fact precludes summary judgment. FED. R. CIV. P. 56(a). We view the evidence in the light most favorable to the nonmovant. *Cooper*, 876 F.3d at 128. Insurance disputes often are resolved at the summary judgment stage because the interpretation of an insurance policy presents a question of law. *Id.*

## DISCUSSION

### I. The Subcontractor Settlements Are "Other Insurance"

The most fundamental argument S&P makes on appeal is that because the subcontractor settlements were not the product of *insurance* coverage, U.S. Fire is not entitled to use them to offset amounts covered by its own policy to prevent double recovery. U.S. Fire's policy provides coverage for property damages caused by an occurrence in excess of the "Retained Limit," which is defined as the following:

> 1. [W]ith respect to any "Occurrence" that is covered by "Underlying Insurance" or "Other Insurance," the total of the applicable limits of "Underlying Insurance" or "Other Insurance"; or
>
> 2. [W]ith respect to any "Occurrence" that is not covered by "Underlying Insurance" or "Other Insurance," the amount of the Self-Insured Retention stated in Item 4.(f) of the Declarations.

"Underlying Insurance" is essentially the primary layer of insurance (here the AGLIC policy). "Other Insurance" is defined in the policy as "any type of Self-

---

one occurrence or from multiple occurrences, and U.S. Fire's argument that the "Your Product" exclusion in its policy bars coverage.

Insurance or other mechanism by which an Insured arranges for funding of legal liability for which this policy also provides coverage."

S&P characterizes the subcontractor settlements as the products of "contractual risk transfer mechanisms." It defines "contractual risk transfer" as "[t]he use of contractual obligations such as indemnity and exculpatory agreements, waivers of recovery rights, and insurance requirements to pass along to others, but would otherwise be one's own risk of loss."[8] Reasoning that the indemnity clauses in the subcontractor contracts were intended to "shore up leaks or gaps in insurance coverage," S&P argues that U.S. Fire had no right, either contractual or equitable, to avoid paying the shortfall since the subcontractor *indemnity* payments were meant to be applied to the gaps in the U.S. Fire coverage.

In *RSR Corp. v. International Insurance Co.*, this court encountered a similar question. 612 F.3d at 854. There, a subsidiary of a company called RSR smelted lead for more than ten years on Harbor Island near Seattle, Washington. *Id.* Harbor Island suffered substantial environmental damage during those years. When the EPA sought recovery from RSR for the costs associated with the environmental damage, RSR sued fifty-three of its comprehensive general liability (CGL) insurers to satisfy the judgment. *Id.* at 855. RSR entered into thirty-six separate settlement agreements with these insurers and received an aggregate payment of over $76,000,000. *Id.* at 856.

RSR then sued International Insurance Co.—who had issued successive layers of insurance policies to RSR—seeking payment to cover RSR's approximately $13,000,000 of remaining liability. *Id.* at 856–57. The district court found that RSR could not recover anything under International's policies

---

[8] To support this proposition, S&P cites IRMI.com.

because RSR had already fully recovered the cleanup costs of Harbor Island from its settlements with the thirty-six GCL insurers. *Id.* at 857. In other words, none of the costs RSR incurred that were covered under International's policy pierced RSR's first layer of insurance.

On appeal, RSR argued before this court that the district court's award of summary judgment to International was inappropriate because International's insurance policy, which barred recovery when costs had already been recouped under "other insurance," did not apply to the *settlement* proceeds from the GLC insurers. *Id.* at 858. Affirming the district court, this court rejected RSR's contention, stating that "[t]he existence of other insurance that covers the same liability as the Environmental policies is what triggers the condition, whether or not recovery under this other insurance is actually sought." *Id.* at 859. According to the *RSR* court, "[t]he relevant question is whether RSR sought to recover for liabilities under its Environmental policies that were also recoverable under its CGL policies." *Id.*

The district court here, after reviewing *RSR*, said S&P's argument that the subcontractor *indemnity* agreements were not *insurance* agreements is a "distinction . . . without a difference." In both the present action and *RSR*, "the insured suffered a partially covered loss, received a bucket of undifferentiated money to cover the loss, and then tried to recover on an excess policy, arguing that it did not have to apply the settlement money to the covered loss." Acknowledging that the *RSR* court stressed that the settlements were with other insurance companies, the district court reasoned that this was "not relevant when, as here, the US Fire policy is clearly an excess policy."[9]

[9] The district court further explained that its reasoning is consistent with other portions of *RSR* and Texas case law.

The reasoning of *RSR*, though helpful, does not track perfectly onto the present dispute. There the question was whether the settlements with the first layer insurance providers technically counted as "other insurance" under the excess insurer's policy. 612 F.3d at 858–59. And the *RSR* court found that the settlement proceeds did count as other insurance under the policy language because the insured sought to recover from the first layer insurance providers. *Id.* at 859. Here the settlements did not come from insurance providers, but subcontractors. Although *RSR* can provide guidance on how to read the policy at issue, it does not control. The question we face is simply whether U.S. Fire's policy allows it to count the arbitration agreements as "Other Insurance." The answer lies in the language of U.S. Fire's policy.

The plain language of the policy allows us to affirm the district court's summary judgment order. An indemnity agreement falls under the plain language of the "Other Insurance" provision of U.S. Fire's policy—which is very broad—because it is a "mechanism by which an Insured arranges for funding of legal liabilities for which [U.S. Fire's] policy also provides coverage." And, under the reasoning of *RSR*, settlement proceeds resulting from an indemnity agreement also count as "Other Insurance."

S&P provides no persuasive authority supporting its contention that subcontractor indemnification agreements are, by their nature, meant principally to fill gaps in insurance coverage (and therefore do not fall into the policy language here because the indemnity agreements would cover legal liabilities that U.S. Fire's coverage did not). The most S&P offers in support of this contention is one case from the Florida Supreme Court suggesting that an indemnity clause is a "hedge[]" as to risk retained by the insured contractor. *Intervest Constr. of Jax, Inc. v. General Fidelity Ins. Co.*, 133 So.3d 494, 503 (Fla. 2014). But this case only stands for the proposition that a general

contractor can apply proceeds obtained from subcontractor indemnification settlements to satisfy a "self-insured retention" clause, instead of having to pony up its own money to pay the self-insured retention. Even if the case constituted persuasive authority, it is far off the mark.

And S&P has offered no good reason to think that these particular indemnity agreements were meant first and foremost to fill gaps in its excess insurance coverage (i.e., to cover mold damages and legal fees). S&P cites language from the subcontracts stating: "The maintenance of the Insurance referred to in this Subcontract shall not diminish the Subcontractor's obligations hereunder or Subcontractor's agreement of indemnification." But the "Insurance" referenced is the insurance the *subcontractors* had to maintain, not S&P. So it does not appear that this language—or S&P's argument—is relevant to the present dispute.

Reversing the district court's summary judgment in favor of U.S. Fire is not appropriate on this ground.

II. S&P's Burden to Allocate

S&P argues that the district court erred when it placed the burden on S&P to show that the subcontractor settlements were allocated to either covered or noncovered damages under U.S. Fire's policy. In S&P's view, it had the right to allocate the settlement proceeds to the damages not covered by U.S. Fire's policy.

S&P supports its contention that it had the right to allocate however it wished by analogizing to the "actual injury" rule from Texas law. Under this rule, when damage to an insured occurs during the period covered by separate and distinct insurance policies, all of the policies are triggered and the insured may collect from the policy with the highest coverage limit. *See Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 758–59 (Tex. 2013). Texas law reasons

that the insured (rather than the insurance companies) is generally in the best position to identify the policy or policies that would maximize coverage. *See id.* According to S&P, the actual injury rule should be extended to apply so that an insured can choose whether to allocate settlement proceeds to covered or noncovered damages under an insurance policy because the insured is in the best position to identify how best to allocate to maximize coverage.

The district court rejected S&P's proposal to extend the actual injury rule, explaining that the actual injury rule "is not applicable here. The issue here is whether an insured can round up general settlements from its subcontractors, unilaterally decide that they will be allocated to uncovered damages, and then go after the insurers that would cover the damages if the loss was properly allocated to that policy." Instead, the district court observed that "Texas courts generally put the burden on the insured to identify the portion of a liability or loss that was produced by a covered condition." (citing *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App. 2003)).

To justify placing a burden on S&P to show that the subcontractor settlement proceeds were allocated between covered and noncovered damages under U.S. Fire's policy, the district court again turned to *RSR*. After discussing whether a settlement payment could be other insurance, the *RSR* court was asked to decide "whether or not the CGL settlements compensated RSR fully for its Harbor Island liabilities." *RSR*, 612 F.3d at 861. As discussed above, RSR collected over $76,000,000 from the CGL settlements with thirty-six of its insurers. *Id.* at 856. But, even after amassing this sum, RSR claimed to have a shortfall of over $13,000,000 from the environmental liabilities associated with Harbor Island. *Id.* at 861. RSR looked to collect from its second layer insurance provider, International. *Id.*

If the CGL settlements only partially covered RSR's liabilities, then International's policy would serve as excess insurance for the uncovered portion. *Id.* International argued that it was RSR's burden under Texas law to show that it allocated the settlement proceeds. *Id.* Because RSR failed to allocate the proceeds, International argued that Texas law presumed that the full amount of the CGL settlements had to be allocated to the liabilities that would also be covered under the insurance policy. *Id.* As a result, if RSR bore the burden to allocate the proceeds (which it failed to do), then all of the $76,000,000 would be attributed to the environmental liabilities and there would be no shortfall for International to cover. *See id.* If RSR had properly allocated the settlement proceeds, then there would have been a shortfall and International's excess coverage policy would have been implicated.

The *RSR* court relied upon one Texas Supreme Court case in particular when concluding that Texas law placed the burden on RSR to allocate the settlement proceeds. Acknowledging that *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917 (Tex. 1998) was not directly on point, the *RSR* court said *Ellender* "indicates how [the Texas Supreme Court] would rule in [*RSR*]." *Id.* In *Ellender*, an independent contractor died from exposure to benzene. *Ellender*, 968 S.W.2d at 920. The contractor's family members sued multiple parties they claimed were responsible for his death. *Id.* All of the defendants settled except for one, Mobil. Mobil and the family went to trial, and the jury returned a verdict in favor of the family. *Id.*

The issue the Texas Supreme Court had to decide on appeal was how the settlement with the other defendants affected the jury's verdict. Of particular importance was the question of "which side bore the burden of allocating the settlement amounts between actual and punitive damages." *RSR*, 612 F.3d at 861 (discussing *Ellender*, S.W.2d at 926). The Texas Supreme Court observed

that "settling plaintiffs are in a better position than nonsettling defendants to insure that the settlement award is allocated between actual and punitive damages." *Ellender*, 968 S.W.2d at 928.

The linchpin of that court's reasoning was its concern that a litigant who is not party to the settlement had "almost no ability to prove which part of the settlement amount represented actual damages. Nonsettling parties should not be penalized for events over which they have no control." *Id.* The Texas Supreme Court ultimately concluded that "[t]he better rule is to require a settling party to tender to the trial court, before judgment, a settlement agreement allocating between actual and punitive damages as a condition precedent to limiting dollar-for-dollar settlement credits to settlement amounts representing actual damages." *Id.* Thus, where a settling party failed to allocate its settlement, the nonsettling party was entitled to a credit equaling the entire settlement amount.

The *RSR* court found *Ellender* analogous. "International should not be penalized for the fact that no allocations were made. Nor should RSR be rewarded for failing to track each of its liabilities diligently through to the end of its negotiations." *RSR*, 612 F.3d at 862. Because RSR failed to allocate its settlement amounts, the court determined that it failed to meet its burden and affirmed the district court's take-nothing judgment in favor of International. *Id.* at 862–63.

The district court here found the *RSR* court's analysis (and, by extension, the Texas Supreme Court's reasoning in *Ellender*) to be analogous and persuasive, so it held that S&P bore the burden to allocate its settlements with its subcontractors between covered and noncovered damages under U.S. Fire's policy. S&P protested that the *RSR*/*Ellender* rule should not apply because, unlike in those cases, U.S. Fire had knowledge of the settlements and was

regularly informed of the arbitration proceedings. U.S. Fire even informed S&P that it would not object to any "reasonable settlement" between S&P and the subcontractors. Because the Texas Supreme Court's core concern in *Ellender* was that "[n]onsettling parties should not be penalized for events over which they have no control," *Ellender*, 968 S.W.2d at 928, S&P argued that it should not bear the burden to show allocation. Rejecting S&P's argument, the district court reasoned that even if U.S Fire did have more knowledge here than International or Mobil, U.S. Fire "did not[] have the power to structure its subcontractor settlements to ensure a clear allocation of the settlement proceeds by specifying which amounts were for the covered damages and which amounts were for uncovered damages."

On appeal, S&P continues to press its argument that the *RSR*/*Ellender* rule does not apply, especially because U.S. Fire consented to the settlement. U.S. Fire responds that by consenting to the settlement, it did not forfeit "rights to insist upon a proper allocation of settlement proceeds." And U.S. Fire never agreed that the settlement funds could be applied solely to uncovered losses under the policy.

The reasoning of the district court is persuasive. And we found no Texas case that casts doubt on either *Ellender* or the district court's conclusion that Texas law places the burden of proof on S&P to show that it properly allocated the settlement proceeds between covered and noncovered damages. On the contrary, Texas Supreme Court cases have reaffirmed this principle. *See, e.g.*, *Utts v. Short*, 81 S.W.3d 822, 829 (Tex. 2002) ("As we recognized in *Ellender*, a nonsettling party should not be penalized for events over which it has no control." (citing *Ellender*, 968 S.W.2d at 927)); *Carl J. Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893, 911 (Tex. 2005) ("In some contexts, we have permitted settling parties to agree how to allocate settlement payments.").

*Ellender* indicates how the Texas Supreme Court would decide the present dispute.

S&P bears the burden to show that the subcontractor settlement proceeds were properly allocated to either covered or noncovered damages. If S&P cannot meet that burden, under the reasoning of *RSR* and *Ellender*, then we must assume that all of the settlement proceeds went first to satisfy the covered damages under U.S. Fire's policy. Although U.S. Fire agreed that S&P could reasonably settle its claims with the subcontractors, that does not mean U.S. Fire granted S&P permission to allocate all of those settlement proceeds to noncovered damages. And, as the district court noted, U.S. Fire did not have power to structure the settlements to attribute the proceeds to one kind of damages or another. The district court did not err by placing the burden on S&P.

III. Allocation of the Settlement Proceeds

We need not consider whether S&P raised a fact issue regarding whether it allocated the settlement proceeds between covered and noncovered damages. Although S&P attempted to raise that issue before the district court in a supplemental brief, the district court found that argument untimely and unpersuasive on the merits. ("Summary judgment is not an iterative process, with the parties presenting new arguments and evidence in piecemeal fashion, after learning that their initial strategy did not pan out.").

Whether the district court was correct is not a question that we need to decide because S&P only raised the issue of whether it adequately allocated in its reply brief. ("While not the type of detailed allocation to which U.S. Fire believed it was entitled, at all times, S&P made it clear that the Subcontractor Settlements were made up of the excluded mold damages, which are excluded under virtually every CGL policy issued to insured in the United States, as

well as the $1,500,0000 in attorney's fees for which coverage under Texas law remains uncertain."). An argument that is not pressed in the original brief is waived on appeal. *United States v. Green*, 46 F.3d 461, 465 n.3 (5th Cir. 1995). And, in any event, S&P admits that it did not provide a detailed allocation.

The district court did not err granting summary judgment in favor of U.S. Fire or denying summary judgment to S&P and Amerisure.

## CONCLUSION

We AFFIRM the district court's order awarding summary judgment to U.S. Fire and denying S&P and Amerisure's motion for summary judgment.